UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. |
| | : | |
| v. | : | Under Seal |
| | : | |
| **DANIEL CROSBY,** | : | VIOLATIONS: 18 U.S.C. § 371 |
| | : | (Conspiracy). |
| **Defendant.** | : | |

**I N F O R M A T I O N**

The United States Attorney informs the Court:

**COUNT ONE**

**Introduction**

At all times material to this Information:

1.   Guaranty Residential Lending ("GRL") was a subsidiary of Guaranty Bank, a financial institution with deposits insured by Federal Deposit Insurance Corporation.

2.   National City Mortgage ("NCM") was a subsidiary of National City Bank, located in Miamisburg, Ohio, and was a financial institution with deposits insured by Federal Deposit Insurance Corporation.

3.   GRL and NCM (at times referred to as "the lenders") were in the business, among other things, of loaning money to individuals to purchase residential real estate ("buyers").

4.   Buyers often engage real estate agents to assist them with finding a property, researching the appropriate price to offer for a property, and submitting a real estate offer or contract on the property.

5.   Once a seller accepted a buyer's offer, then buyers may obtain a residential real estate loan to assist them in purchasing the property. These loans would either be for:

    a.    A property which is in need of repair and rehabilitation. In such a case, the mortgage loan will cover the cost of the property "as is" and the cost of proposed renovations. For this type of loan, called a home improvement loan, the lenders require written plans for the rehabilitation and will set aside money in escrow, payable only upon proof that the renovation work has been completed.

    b.    A property which does not need repair or renovation. In this case, the mortgage loan will cover the cost of the property alone.

6.    Before GRL and NCM would lend money to a buyer, the property must have been appraised by an appraiser who was licensed in the same jurisdiction as the property location; the lenders would rely upon the accuracy of the appraisal to insure that they did not loan money to the buyers in an amount that exceeded the value of the property. This appraisal would either:

    a.    Value the property as it would be would be worth after planned renovation (checking a box marked "subject to the repairs, alternations, inspections, or conditions listed below"); or

    b.    Value the property as it currently exists without any additional renovation (checking a box marked "as is").

7.    If the appraisal valued the property "as is" and the value were for a significant amount of money (typically, over $300,000 to $400,000), then the lenders would conduct a more limited review of the buyer's income and assets, as the value of the property itself would support the mortgage, and if there were a default, the lenders would be able to recoup their investment by foreclosing and reselling the property.

8.    If a loan were approved, the lenders would instruct a title and escrow agent about the documents to prepare and money to collect. The title and escrow agent would conduct a "settlement," that is, a meeting where the buyer and seller would sign documents transferring the property and agreeing to the terms of the loan; typically, the real estate agent would be present at the settlement.

9. The defendant DANIEL CROSBY was a licensed real estate agent in the District of Columbia.

## The Conspiracy

10. From in or before October 2002, and continuing thereafter through at least May 2003, in the District of Columbia and elsewhere, the defendant DANIEL CROSBY did unlawfully and knowingly conspire, combine, confederate, and agree with other persons both known and unknown to the United States to commit offenses against the United States, that is, engaging in a scheme to defraud and obtain money and property by means of false and fraudulent pretenses, representations, and promises from financial institutions, in violation of 18 U.S.C. §§ 1344 and 2.

## Goal of the Conspiracy

11. It was a goal of the conspiracy that defendant DANIEL CROSBY and his co-conspirators would make money by:

   a. finding distressed District of Columbia homes which could be purchased for a low price and then quickly resold for a much higher price within a short period of time;

   b. recruiting buyers who did not provide the requisite cash at settlement and did not expect to fund the mortgage payments themselves ("straw buyers");

   c. originating loans which either did not meet the lenders' requirements or provided false information in order to qualify for the loans;

   d. fraudulently inflating the appraisal, or value, of residential real estate, thus causing lenders to lend more money than the property was worth;

   e. creating false documents which would assist in the settlement of the loans, after which the co-conspirators would obtain money for the completion of the real estate sales.

**Manner and Means**

12. It was a part of the conspiracy that a loan officer at GRL recruited straw buyers with good credit by promising an "investment opportunity." The loan officer told the straw buyers that if they paid him an "investment fee" of a few thousand dollars, that he would:

   a. find distressed homes in the District of Columbia for the buyers to purchase without paying the required "cash from borrower";

   b. renovate the properties; and

   c. pay the mortgage until the properties were renovated and could be resold.

13. It was a further part of the conspiracy that the defendant DANIEL CROSBY and other co-conspirators would find District of Columbia homes that would be targeted for "flip sales" or quick resale at a fraudulently inflated price.

14. It was a further part of the conspiracy that the defendant DANIEL CROSBY would assist the co-conspirators in finding recent sales prices for properties in the same geographic area for properties which were not renovated and those which were completely renovated.

15. It was a further part of the conspiracy that co-conspirator Robbie Colwell would assume the identity of appraisers to write false appraisals, falsely reporting the conditions of the properties, stating that the properties were renovated when, in fact, they were not, thus creating fraudulently inflated appraisals which dramatically overstated the value of the properties.

16. It was a further part of the conspiracy that the loan officer prepared or caused to be prepared loan applications for the straw buyers seeking approximately $8.7 million in loans to purchase the properties.

17. It was a further part of the conspiracy that when the original seller required proof of the co-conspirator's ability to purchase the property, then the defendant DANIEL CROSBY would ask co-conspirator Robbie Colwell for letters which would falsely report that a lender would be loaning money whereas, in truth, the funds to purchase the properties were paid from the proceeds of the sale of the property.

18. It was a further part of the conspiracy that co-conspirator Alan R. Davis and other co-conspirators purchased the properties at the original price, and, at times on the same day, quickly resold the "flipped" property to the straw buyer at the price of the inflated appraisal. The proceeds for each "flip" sale, which represented the difference between the original price the co-conspirators paid for the property and the amount that the straw buyer paid for the property (which was supported by the fraudulently inflated appraisal), ranged anywhere from approximately $150,000 to $350,000 per property.

19. It was a further part of the conspiracy that the defendant DANIEL CROSBY would draw up the real estate contracts for the co-conspirators to purchase the properties; at times, CROSBY would also send the real estate contracts to co-conspirator Vicki A. Robinson, a title and escrow agent at the title company, who would handle all of the settlements of these properties.

20. It was a further part of the conspiracy that the defendant DANIEL CROSBY would provide other services in order to ensure that the co-conspirators sold the properties to the straw buyers; for example, the defendant CROSBY purchased home insurance as required by the lender as a pre-requisite of the mortgage loan.

21. It was a further part of the conspiracy that as a result of the false loan applications, the fraudulently inflated appraisals, the home insurance, and other actions, the defendant DANIEL CROSBY and his co-conspirators caused the lenders to issue loans to the straw buyers in amounts

that were more than the properties were actually worth, thus creating a large amount of illegal proceeds when the properties were "flipped" to the buyers.

22. During the course of the conspiracy, and in the manner described above, the defendant DANIEL CROSBY assisted in the purchase and/or resale of 20 properties; the mortgages on all 20 properties are in default or have been foreclosed. The lenders have lost, or expect to lose, approximately $3.2 million upon resale of these properties.

## Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, the defendant DANIEL CROSBY and other members of the conspiracy committed the following overt acts, among others, in the District of Columbia and elsewhere:

### 16 Seaton Place, N.E.

23. On or about January 10, 2003, in the District of Columbia, a co-conspirator falsely appraised 16 Seaton Place, N.E., Washington, D.C. ("16 Seaton Place, N.E.") as worth $525,000, claiming that the "subject [was] of good quality construction and [was] in good condition due to overall rehabilitation and remodeling of entire home;" GRL relied upon this false appraisal in its decision to loan $400,000 to the buyer.

24. On or about March 25, 2003, in the District of Columbia the defendant DANIEL CROSBY requested that Robbie Colwell send him Colwell's appraisal via electronic mail.

25. On or about April 1, 2003, a person purchased 16 Seaton Place, N.E. for $228,000; on the same day, the person sold 16 Seaton Place, N.E. for $535,000, with a loan obtained as more fully described in the manner and means, above.

26. On or about April 2, 2003, co-conspirator Vicki A. Robinson wrote a check to the defendant DANIEL CROSBY for $2,030.00 for reimbursement for CROSBY's purchase of insurance for the property at 16 Seaton Place, N.E.

### 1607 Lincoln Road, N.E.

27. On or about December 10, 2002, in the District of Columbia, the defendant DANIEL CROSBY sent instructions and a real estate contract via facsimile to co-conspirator Vicki A. Robinson to prepare for the sale of 1607 Lincoln Road, N.E., Washington, D.C. ("1607 Lincoln Road, N.E."); the contract, dated December 9, 2002, allowed co-conspirator Alan R. Davis to purchase the property for $185,000 and the sale was "strictly 'as is.'"

28. On or about December 11, 2002, in the District of Columbia, co-conspirator Robbie Colwell falsely appraised 1607 Lincoln Road, N.E. as worth $525,000, referring to the "overall rehabilitation, and remodeling of entire home," well knowing that the subject property was not in renovated condition; NCM relied upon this false appraisal in its decision to loan $472,500 to the buyer.

29. On or about December 15, 2002, in the District of Columbia the defendant DANIEL CROSBY sent a request to co-conspirator Robbie Colwell to create a letter which falsely stated that Capital Financing Group would loan money to co-conspirator Alan R. Davis to purchase 1607 Lincoln Road, N.E. for $185,000.

30. On or about December 31, 2002, co-conspirator Alan R. Davis purchased 1607 Lincoln Road, N.E. for $185,000; on or about seven days later, on January 7, 2003, Davis sold 1607 Lincoln Road, N.E. for $525,000.

31. On or about January 9, 2003, co-conspirator Vicki A. Robinson wrote a check to the defendant DANIEL CROSBY's real estate group for $5,550.00; this check was funded by the sale of 1607 Lincoln Road, N.E.

**(Conspiracy, in violation of Title 18, United States Code, Section 371.)**

KENNETH L. WAINSTEIN

United States Attorney
for the District of Columbia


By: _____
VIRGINIA CHEATHAM
Assistant United States Attorney
D.C. Bar # 411980
United States Attorneys Office
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530