UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Criminal No. 05-377 (RWR) |
| | : |
| v. | : |
| | : |
| DANIEL CROSBY, | : |
| Defendant. | : |

**GOVERNMENT'S CONSOLIDATED MOTION PURSUANT
TO FEDERAL SENTENCING GUIDELINES SECTION 5K1.1
AND MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, moves pursuant to Section 5K1.1 of the Federal Sentencing Guidelines for a downward departure based on the defendant's substantial cooperation with law enforcement. Defendant Daniel Crosby is scheduled to be sentenced by the Court on March 9, 2007. In support of its motion and in aid of sentencing, the government submits the following:

## BACKGROUND

**I.    Loan Officer**

This case involved a well-planned and organized scheme to "flip" over 30 residential properties in the District of Columbia; a scheme which netted $5.2 million to the main co-conspirator and caused a loss to the banks of over $5 million. Defendant Daniel Crosby joined the conspiracy in 2003 and assisted Charles E. Hall, Sr. and other co-conspirators who targeted Washington, D.C. homes for "flip sales" or quick resales at fraudulently inflated prices. Hall, the main co-conspirator, recruited people to act as the "straw buyers," people who would have the property in their names, but not have to pay the down payments or the mortgages. Hall worked as a loan officer for Guaranty Residential Lending (GRL), and through this position, he submitted loan applications for these straw buyers seeking approximately $14 million in loans to purchase the properties; these loan applications

falsely listed the straw buyers' assets (such as real estate owned and earnest money deposits) and falsely stated other information (such as salary, marital status, and intention to live in the properties).

**II.     Appraiser**

Hall paid co-conspirator Robbie Colwell[1] to write dishonest appraisals falsely reporting the conditions of the properties and stating that the properties were renovated when, in fact, they were not. Colwell, who was not even a licensed appraiser, stole actual appraisers' names and licenses to write completely fabricated reports on the value of the houses. The appraisals almost uniformly claimed an "overall complete rehabilitation and remodeling of entire home" and that "the subject property has a new roof, windows, new kitchen, bathrooms, new floor," or "the subject property has been recently renovated and has a modern kitchen." In reality, the properties were in terrible shape – none had renovated kitchens or bathrooms; many had crumbling walls and ceilings; and one was merely a shell, with no interior walls or floors at all. These fraudulently inflated appraisals, which dramatically overstated the value of the properties, caused the banks to loan out a much higher mortgage based on a much higher sales price.

Once defendant Crosby joined the scheme in 2003, Colwell sent by electronic mail many of these appraisals to Crosby. Having seen many of the properties, Crosby knew or should have known that the properties had not been renovated and that the appraisals were false.

**III.    Underwriters**

The banks' underwriters approved the loans. In the beginning of the scheme, co-conspirators

---

[1] On January 8, 2007, Robbie Colwell was sentenced to 46 months incarceration.

Marcus Wiseman[2] and Susan Conner[3] worked as underwriters at GRL, the same bank which employed Charles Hall. The underwriters' job was to safeguard the bank's money. They were to review the loan applications, the appraisals, and the title histories to ensure that the collateral supported the loan and that the borrowers were able to repay the mortgage. If they approved the loan, they would put conditions on the sales such as requiring that the buyers make a down payment, that is, to have a financial interest, in the properties to secure the mortgage.

The underwriters failed to do their job. Susan Conner approved loans which did not meet the banks' requirements; she approved the inappropriate loans because Charles Hall paid her money to do so. Marcus Wiseman accepted payments from Charles Hall in exchange for reviewing the loans more quickly than other loans. Later, Wiseman and Conner both left GRL and went to a competitor, National City Mortgage (NCM). Instead of turning to another GRL-employed underwriter to approve his loans, Charles Hall took his business away from his employer (through a loan broker) and to the competitor NCM where Wiseman and Conner again approved his loans and again, Charles Hall paid them money. Either Wiseman or Conner approved every one of the 32 loans listed in the Indictment.

**IV.   Speculator**

By using the false loan applications, the inflated appraisals, and the fraudulently obtained underwriting, Charles Hall and his co-conspirators caused the banks to issue loans to the straw buyers in amounts that were much more than the properties were actually worth, thus creating a large

---

[2]On December 11, 2006, Marcus Wiseman was sentenced to five years probation.

[3]On December 20, 2006 Susan Conner was sentenced to one month incarceration, nine months in home detention, and 3 years of supervised release.

amount of illegal proceeds when the properties were "flipped" to the buyers. Co-conspirator Alan R. Davis[4] (and later another person doing business under the name "Network Venture Capital") purchased the properties, and, many times on the same day, quickly resold the "flipped" properties to the straw buyers at the price of the inflated appraisals. In this manner, a huge amount of money was generated for the co-conspirators. In one day, a single property could produce between $150,000 and $400,000 of cash for the conspiracy; these amounts are based on the difference between the sales price Davis or Network Venture Capital paid for the property and the sales price created when the property was resold to the straw purchaser and justified by the false appraisal. The following are a few examples of the "same day flips":

>  *17 Seaton Place, N.E. purchased on March 28, 2003 for **$260,000** and resold on the same day for **$525,000**, more than double the first sales price;

>  *16 Seaton, Place, N.E. purchased on April 1, 2003 for **$228,000** and resold on the same day for **$535,000**, or $307,000 more than the first sales price;

>  *1423 New Jersey Ave, N.W. purchased on April 28, 2003 for **$180,000** and resold the very next day for **$533,333**, a difference of $353,333, almost a three-fold increase;

>  *224 P Street, N.W. purchased on May 13, 2003 for **$245,000** and resold on the same day for **$550,000**, a difference of $305,000;

## V. Settlement Agent

In order to carry on the conspiracy, the co-conspirators ignored the banks' closing instructions to the settlement company. As a condition of the sale, the underwriters required the buyers to bring cash to the settlement table for the purchase of the houses. The settlement statements reflected this fiction, that the straw purchasers provided a "down payment," by listing specific dollar amounts as coming from the buyer. In reality, however, the straw buyers did not pay a dime.

---

[4] On January 17, 2007, Alan Davis was sentenced to 10 months in prison.

Charles Hall had recruited the purchasers with the promise that they would not be required to make any payments (other than, at times, $5,000 which the purchasers paid directly to Hall). Although the banks believed that the settlement agent followed their instructions regarding the required purchasers' payments, in reality, she did not. Defendant Vicki Robinson[5] was the settlement agent on virtually all of 32 loans financed by GRL or NCM. As the settlement agent, Robinson's job was to follow the banks' instructions, collect money, and disburse the proceeds. Indeed, Robinson signed the "closing instructions" forms which the banks issued to the settlement company; she also signed all of the checks disbursing the banks' loan money from the sales.

Instead of following the banks' instructions, Vicki Robinson instead complied with Hall's directions on how to conduct the closings and settlements of the property sales. Even though Hall was not the seller and not the one entitled to the profit, Robinson allowed Hall to decide who should get paid from the loan money (she even signed over $45,000 of the banks' loan money to Passport BMW to buy a car for Hall).

After each sale, Vicki Robinson gave a portion of the bank's loan money to either Davis or (more often) Hall with the instructions that they convert the money into a cashier's check in the exact amount that the straw purchaser was to bring as "cash from borrower" to the settlement table. In the very beginning, Davis was the one who received the money from Robinson and then returned with the cashier's check or wire transferred the money due and owing from the straw purchaser. Soon, Hall took over the job and converted the loan money into the fictitious "down payment" cashier's check purportedly from the purchaser. Each and every time, Robinson, Davis, and Hall knew that the cashier's checks paying the buyers' down payment were coming from Hall and Davis and were

---

[5]Vicki Robinson is currently scheduled for sentencing on March 23, 2007.

funded by the banks' own loan money, rather than legitimately coming from the buyers from their own finances. Robinson, Davis, and Hall also knew that the banks required the purchaser to pay the down payment so as to assure the buyers' financial interest in the property. Using this scheme, the co-conspirators tricked the banks into loaning enormous mortgages grossly in excess of the actual value of the properties. The banks were under the mistaken belief that the houses were actually worth the inflated price and that the buyers had a financial interest in the properties from putting their own money down toward the purchase.

## VI.     Real Estate Agent

Daniel Crosby assisted the conspiracy in many ways. Crosby assisted in finding run-down, inexpensive, properties in the District of Columbia. In the beginning of the scheme, Mr. Crosby found the distressed properties for purchase by co-conspirator Alan R. Davis. (Later, Mr. Crosby found properties for Hall, so that Hall could use the Network Venture Capital name to flip the properties).

Crosby also assisted the scheme by researching the sales prices of other comparable properties from the same neighborhood (data known in the trade as "comps"). At the request of Alan Davis (or Charles Hall), Crosby researched the prices of houses which were in the same, not renovated, condition as the subject properties in order to assist Alan Davis (or Hall) to determine the appropriate buying price to offer for the un-improved house. Then, Crosby (again at the request of Davis and/or Hall) researched the prices of houses which had already been renovated, so that Alan Davis and Charles Hall would know the price to sell the property to the straw buyers.

Daniel Crosby also assisted in creating or gathering various documents necessary for the two sales. For example, typically, it would be Crosby who gave the real estate contract for the first sale

to Vicki Robinson, the settlement agent. This first sale would show the initial price that Alan Davis (or another) agreed to "pay" for the first purchase. In truth, Davis (and the other) did not pay for the property at the first settlement, but rather waited until they sold it that same day or next to use the victim banks' money to pay for the initial purchase of the property. With respect to the second, flipped sale, Crosby also assisted by obtaining property hazard insurance, which was required by the banks in order to secure the mortgage loans.

Crosby was present at the real estate settlement proceedings for the first sales and would not receive commission payments for the first sales until after the flipped sales. After the second sales, that is, after the straw purchasers bought the properties, Robinson, at the direction of Hall, distributed the proceeds of the sales to the co-conspirators, including Crosby. Defendant Crosby received money directly from the settlement company as reimbursement for expenses and "assignment of fee;" he also received commissions on each of the first sales from the real estate company.

However, it was Charles Hall who received the majority of the ill-gotten gains, that is, $5.2 million of the loan proceeds. Hall used the money to live a lavish lifestyle, to pay off the co-conspirators, and to fund the continuation of the scheme. The mortgages on all but one of the 32 properties defaulted and foreclosed or sold before foreclosure for a loss. The banks resold the properties (in a strong real estate market) but still sold the properties for less than the amount of the mortgage loans. After reselling the properties, the banks were left holding mortgage loans in excess of the value of the properties. After resale, the banks were *still* left with a loss in excess of $5 million.

Charles Hall elected to go to trial, and on August 3, 2006, a federal jury convicted him of all eight counts of the Indictment charging him with conspiracy, bank fraud, wire fraud, and conspiracy

to launder money. He was sentenced on December 8, 2006, by the Honorable Sterling Johnson, Jr., sitting by designation from the Eastern District of New York, to 293 months incarceration.

## DISCUSSION

Daniel Crosby was the last co-conspirator to be approached by law enforcement and therefore the last to plead guilty. At the time that he was approached, Crosby told others (who were FBI subjects and targets) that the FBI had contacted him; therefore, Crosby was not able to act in a covert manner with respect to other mortgage fraud matters. However, Crosby provided useful information about Charles Hall, testified for the government in the Hall trial, and provided helpful background information regarding others. Specifically, Crosby was able to assist in locating precise ways in which Charles Hall spent the fraudulently-obtained money; Crosby told the government about specific properties that Hall purchased.. The government was able to serve trial subpoenas and then present the information to the jury based on the information provided by Crosby. Being able to demonstrate how Hall used the fraudulently obtained money enhanced the trial presentation of the government's evidence. In addition, Crosby testified for the government giving compelling testimony about the lies and misrepresentations that Hall had told him; testimony which was corroborated the testimony of the straw purchasers. Daniel Crosby presented himself as a dispassionate witness, although slightly gullible. He answered the questions posed to him with candor and without bitterness.

Taking into account the significant cooperation by Daniel Crosby, and the limited role that he played in the conspiracy, the government recommends that the Court depart downward to Level 10, which sets a sentencing range of 6 - 12 months in Zone B.

CONCLUSION

The government respectfully requests that the Court depart downward and sentence Daniel Crosby in the sentencing range of 6 - 12 months in Zone B and require 100 hours of community service. In addition, the government requests that, pursuant to 18 U.S.C. Section 3664(h), the Court order defendant Crosby to pay restitution in the amount of $128,574, which the parties agree was the amount of money that Crosby received in fraudulently-obtained money and thus an estimate of the Crosby's contribution to the victims' loss.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

By: _____/s/_____
VIRGINIA CHEATHAM
Assistant United States Attorney
D.C. Bar No. 411980
Fraud/Public Corruption
555 4th Street, N.W., 5th Floor
Washington, D.C. 20530
(202) 514-9732

CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of February, 2007, that a copy of the foregoing Motion and Sentencing Memorandum was served via ECF to Curtis Boykin, Esq., counsel for defendant.

_____/s/_____
VIRGINIA CHEATHAM
Assistant U.S. Attorney